Case number 23-1164 et al. Troy Grove, a division of Riverstone Group Inc. and Vermillion Quarry, a division of Riverstone Group Inc. petitioners versus National Labor Relations Board. Mr. Eggers for petitioner Troy Grove. Mr. Davidson for petitioner International Union of Operating Engineers, Local 150 AFL-CIO. Ms. Sheehy for respondent. Mr. Eggers, come speak to us. Thank you, Your Honor. May it please the court, Arthur Eggers, on behalf of petitioner Troy Grove and Vermillion Quarry's divisions of Riverstone. This case has to do with negotiations at the bargaining table. I represented Riverstone at At the bargaining table, I said we were at impasse. I threatened to implement our final offer. After I said that, we did not implement our final offer. We did not make any unilateral changes with regard to wages, hours, terms, conditions of employment. We did not direct deal with employees. In fact, I was talking to the union representative at the bargaining table. We did not present a fiat accompli without an offer to bargain. We were bargaining. We did not make any unilateral changes with regard to wages, hours, terms, conditions of employment. So there's no issue here about whether we, in fact, were at impasse. Had we implemented, that would have been the issue because you can't implement without being at impasse. But one of your arguments, I thought, was that there was an impasse. It certainly is. That's an even-if argument, Your Honor. We thought that was your strongest one, and it's not the most compelling opening on that argument to say, oh, we were still bargaining. Well, given what you've said, Your Honor, maybe I should advance that argument a bit higher on the list. But it was offered as an even-if argument. We believe that correctly it should be analyzed, as Member Kaplan did. And what this should be analyzed as is what is the restriction with regard to us at the table. Can we start with the impasse? Were we, in fact, at impasse? Yeah. Sure. Glad to, Your Honor. So what happened here is that bargaining started in 2016. The prior collective bargaining agreement required contribution to the Midwest Operating Engineers Pension Fund. We went into bargaining with a proposal in the first meeting that would this fund, which is mismanaged, had set out to do its business in a way that had increased our withdrawal liability from $900,000 to $1.3 million, about $400,000 more, about 40 percent more. From that point forward, we proposed getting out of the fund. We would not agree to the fund in the new collective bargaining agreement. Then we fast-forward for the purposes of this discussion to 2021. We're in a bargaining meeting. And I say to the union, will you accept a new contract without contribution to the fund? The union says no. The union asks me a question. Will I accept a new contract that has contribution to the fund? I say no. At that point, we have two positions that are polar opposites, diametrically opposed. And at that point, we are at impasse because of the fact that these are opposites. And so, given what transpired, we were at impasse because at that moment there was no reasonable likelihood that bargaining would get us to a resolution of the issue, the single critical issue under CalMet that we were a part on. So we were, in fact, at impasse. And what happened, it's probably not in the record, but very puzzled by just looking at the course of negotiations, I had that reaction. It seemed like that was an absolute showstopper for you, and the union was insisting on pension contributions, and that was going to be that. But it turns out that wasn't that, and you kept making contributions, and you're still making contributions. Not at all, Your Honor. What happened is that we won. We got a new contract that does not have contribution to the fund. The union got to the point where it gave up and agreed to what we were proposing, and we're not making contribution to the fund anymore. That's what happened. Well, on the issue of impasse, so at the July 12th meeting, didn't Riverstone say that it was open to hearing counterproposals? Yes. On July 12th. So you were not at an impasse on July 12th. Yeah, I asked the question, are we at impasse? And they said no, and they said... And you agreed that you were not at impasse on July 12th. In my opinion, we were, but we didn't declare impasse then, because they said they were going to try to come up with a counterproposal. They were going to try and think outside the box, and so we continued on with negotiations, Your Honor. Right. And then on, I guess, July 14th, the union asked for further information. Yes, Your Honor. So then you wouldn't have been at impasse at that point either. We did not declare impasse. I believe we've been at impasse for a long time, but we continued on with negotiations. We continued supplying information. We did not declare impasse at that time. That's correct, Your Honor. You don't have to declare an impasse, do you? No, we don't, but... You can just implement the disputed term. You can exactly correct, Your Honor, but the issue in this case, as I understand it, is did we declare impasse, which we did, and then is that declaration of impasse the equivalent of an unfair labor practice? That's the issue. Well, you have to be a fool as an employer after this decision, if it stands, to declare it. Well, I think fool understates it. I think maybe suicidal might better describe it. The effect of this decision is a disaster. The purpose of the National Labor Relations Act is industrial peace. That's to be achieved by employees joining unions, bargaining collectively, and having collective bargaining agreements. That's what this law is about that the National Labor Relations Board is supposed to enforce. So why not seek reconsideration based on Member Kaplan's dissent? Because what happened is that the board considered this issue, and it would have been an effort and futility to go through that step, Your Honor. I think... Isn't that required for us to have jurisdiction over the issue under Section 10E? Not after Loper-Bright, Your Honor. How does Loper-Bright intersect with that? Loper-Bright says that it is to the court to make an independent review of issues of law, and the issues that we're dealing with here are issues of law. Nothing can strip this court of what I would say is its right and obligation to determine issues of law. I mean, of course we have an obligation to make determinations of law, but Congress can create statutory schemes of exhaustion that require parties to preserve issues before the agencies. And if a party fails to meet those requirements, we may not have jurisdiction over the issue. Yes, Your Honor, but in 10E, there's nothing that says there's a lack of jurisdiction if the requirements of 10E aren't met. What the board has set out to do is to try and take the position of the folks that are on the bench here today. They're trying to set up procedural hurdles that would prevent this court from deciding issues of law. I think that's absolutely wrong. And can I just ask you one thing that's not... What is the remedy that the petitioners here care about the most? Why are they litigating this? Because the pension issue, as you say, has been resolved. Like, what is the thing, just as a practical matter, that you most care about from this board's decision? As a person who bargains collective bargaining agreements, it is something that prevents me from doing my job. Something that says the board is now going to police what is said at the bargaining table. Not only a huge problem for me, because I want to talk at the bargaining table. I want to say the thoughts that are in my mind. More importantly, that I listen. I want to hear what the other side has to say, right, wrong, or indifferent. Because whatever they tell me is going to give me some insight into the thoughts in their mind. It's going to tell me how they prioritize proposals. It's going to tell me the resolve with regard to issues. And it's going to tell me how I should try to present things to get a collective bargaining agreement. Maybe I'm personalizing this too much, but as a person that negotiates... You're interested in the general principle of law, not in any particular remedy for this party. Well, certainly the remedy here is to do the right thing, and to see to it that we're not found to have violated the act when we didn't. That's the issue. Perhaps I was speaking too personally, and not necessarily on behalf of my client with some of what I said. But certainly, there are going to be bargaining, collective bargaining agreements in the future. I think what I said about me personally is equally applicable to them as a party that's going to be bargaining in the future. This decision is a disaster. It is directly contrary to the National Labor Relations Act. How we got to this point is maybe a matter of amazement to me. If I may speak briefly as... Unless there's anything else with regard to the impasse issue, I could touch on the layoff issue. I'll give you a minute or two. Okay. So another issue here is with regard to layoff. What happened is the two employees received temporary... Weather-related layoff notices. And the nature of the layoff notice is very important because what the board relies upon is the Print Fulfillment Services case. Very, very different, distinguishable, and in fact supports our position in Print Fulfillment Services. The employees received notices of layoff that were not... There was no layoff. There was no layoff. Good for you, but there was a threat. But what kind... It seemed like as tightly connected as can be to the request to leave to monitor the election. But what was that, Your Honor, I think is critical. What that was was a temporary seasonal layoff notice that was rescinded before it took effect. What the board... But the ULP standard is whether the employer is doing anything that could reasonably restrain... Interfere or... Interfere with... Or coerce, yeah. Collective bargaining. So, I mean, you sort of threatened to fire someone and then take it back. I mean, there's still a pretty strong message conveyed. And that's Print Fulfillment Services. That's what you just described, Your Honor, I believe to be Print Fulfillment Services, the equivalent of capital punishment in the workplace. Kind of like killing someone. Our case, because... Unpunished executions are a form of torture. But I would submit, Your Honor, this is very different. Even when you don't kill a person, right? Well, this isn't even an injury, much less a murder. This is a person who received a temporary seasonal layoff notice that was rescinded before it took effect. There was nothing in here about the people getting these notices based on poor work performance, like in Print Fulfillment Services, something that would create a negative record for them. It's not that at all. If our case were Print Fulfillment Services, we wouldn't be having this discussion, right? Judge Rao, anything Judge Randolph? Okay, thank you. We'll give you a rebuttal. Thank you, Your Honor. Appreciate it. All right, next up is the union. Mr. Davidson. Thank you, Your Honors. May it please the court, my name is Steve Davidson. I represent the International Union of Operating Engineers, Local 150, in this matter, which is before the court, as you know, petition for review of a decision of the NLRB. The Labor Board got the decision absolutely correct on all fronts, okay, but we dispute and we have an issue with some of the remedies that the board issued with respect to Riverstone's violation of the 885 and also with respect to not ordering training. Riverstone made a bargaining proposal, as you just heard, attempting to get out of the pension plan. And what happened on July 12th was a complete charade of what, because they had predetermined that they were not going to budge from this. They did not enter negotiations with any spirit of give and take, without any spirit of understanding or wanting to actually negotiate with them. Mr. Davidson, do you agree that the standard of review here is abusive discretion for the board's remedies? Yes. So can you just speak to why there was an abusive discretion? Specifically, yes, because what Riverstone did on the 21st and what they did on July 12th was substantially similar. The board recognized that there was a violation on July 21st and issued an order to remedy that infraction, to remedy that violation. Riverstone's actions on the 12th were substantially similar. They refused to negotiate after we explained that there were issues on the table and after we explained that we were drafting a counterproposal or working on that. But instead, they just got up and left the table and refused to bargain on both the 12th and then on the 21st. And the board's decision itself is internally inconsistent because it ordered a remedy because it recognized the violation on the 21st. That remedy should also apply to the 12th because it's the same action, the same activity from the 12th through the 21st. It was the same charade. They had no intention. And in fact, in Riverstone's brief in support of its exceptions, it states that they believe that they were at impasse on the 12th. So everything that was happening on the 12th and also the 21st, also on the 21st, within two hours after they left the bargaining, what they did is they filed a lawsuit, federal court claiming or alleging in part that we were at impasse. So everything that happened on 21st was happening on the 12th, virtually everything. And therefore, again, the board's remedy is inconsistent. So that's where they've abused their discretion by omitting a remedy they should have awarded for the activities on the 12th. Why do you call their position a charade? And they have a duty to bargain in good faith, but they don't have a duty to make any particular concession. So they come into the bargaining process and say, look, we'll talk about a lot of things. We're not gonna talk about this million dollar withdrawal liability problem. That's just, you know, that's non-negotiable for us. We'll bargain about all the other stuff. That's their position. And they go through years of bargaining on all the other elements. Oh, I call it a charade because what they were doing on the 12th was that meeting on the 12th was more than three years after a bargaining hiatus. So after three years of not bargaining, they come in at the table and disingenuously and sarcastically says- Same position. I mean, you know, there's that crescendo moment with the questions back and forth and we can't review the tone of voice. I get that. But the position they were taking seems consistent with the position they had been taking through the years and years of bargaining, which is we just can't go on in this pension fund. But there is an obligation to listen to the counter-proposals, understand the counter-proposals and have a dialogue back and forth. They were predetermined. They were just going through the motions. They had no interest in bargaining anything. And they said, this is it. My way or the highway, we're leaving. We had wages on the table. We had health insurance contributions on the table. We had a mix of different other issues on the table. We were working on a counter-proposal to address that proposal. And they said, so too bad, we're leaving. And that's where it was all a shrink because they came into the meeting knowing that they were going to leave, knowing that they were going to declare impasse no matter what we said. And in fact, as the board points out, as the ALJ pointed out, there were at least twice where we actually agreed to their proposal. And then as the ALJ said, they moved the goalpost. So after we agreed with their proposal, they backtrack and say, oh wait, that's not good enough. We've got to lump something else on. So this was like, that's why I call this a complete charade of the 12th and the 21st. Okay, thank you. I'll give you rebuttal. We'll hear from the board. Good morning, Your Honor. Good morning, Ms. Sheehy. Yes, may it please the court, Barbara Sheehy for the National Labor Relations Board. I'm going to start with the threat of the unilateral implementation and the impasse issues because it seemed like we gained most traction with the panel on those issues. So first, I just want to address immediately the issue that this decision and order is somehow unprecedented and is a disaster and is going to upend all of collective bargaining. As we pointed out in the brief and it's in the board decision and order, this wasn't new law. In fact, the board cites to- That seems like an exaggeration, but just for my purposes, can you walk me through the impasse determination? I mean, there's certain really sort of basic facts that are awkward for the board. 26 meetings, they're five years after the bargaining agreement has expired. They're three years into a strike. But no bargaining happens during that time, right? There's a complete bargaining hiatus for the three years. And the consistent position of this company is, the one thing we're going to insist on is getting out of this fund, which seems pretty reasonable under the circumstances. And that's their position. So I think the issue is though- Sorry, I don't know if you- I mean, they just sort of never get past that. They come to July 12 after years and years and years, and one side says, will you accept a deal without a pension contribution? No. The other side says, will you accept a deal with? No. But then we know, as Judge Rao points out, other things happened after that. So we were very long, I think, on imposing counsel's presentation about what his view of what happened. But let's remember what's in the board's findings. Other things happen, which is Mr. Eggers says, sure, we'd be interested in a proposal that does not include- And the union says, we're going to try to do that for you. So I think what we could look at as July 12 is more posturing than anything else. We won't accept an agreement with this. We won't accept it with this. And the union goes and caucuses, comes back and says, we're going to try again. And let's remember, historically, the union had on multiple occasions agreed to get out of the pension fund. They wanted more authority though on how employees could allocate their money into different funds. So it wasn't- The union was steadfast on, we are staying in this pension fund, hell or high water. That I don't think was the case. I think the union was trying to leverage the position. It was clear. The employer wanted to leave the pension fund. That is absolutely clear. What is absolutely clear and uncontested is that it was losing money. There was a big withdrawal liability. All of that, everybody understands the employer wanted out. But the union doesn't necessarily say, or what the union's actions conveyed wasn't that there wasn't room for movements. They do go back and they caucus. They submitted information requests. The employer says, we'll try to respond to that. They do respond to that before the July 21st meeting. I think there's an initial round of information that's given, but it's not fully complied with. And then you have, I think at that point, pure frustration out of the employer. Understandable, but still unlawful. Still unlawful to say when there are issues on the table. So if the employer wants to claim single issue impasse, setting aside the fact that there was still that outstanding information request. And the board law is very clear on this. If there's an outstanding information request, you cannot be at impasse. They don't accept that. That can't be right. It is. Then there will never be an impasse. No, that's not true. It's if you look at the circuit case law, right? Mike sells potato chips, right? Saying that you can't strategically avoid impasse just by continuing to ask for information. Right. So what we have here, though, is there's no, so the board makes this finding. The board, in its decision, modifies the administrative law judge's decision and says, on top of all the reasons that the ALJ did not find the parties at single issue impasse or impasse in particular of the three-prong test on the pension fund issue in particular, so just prong one, the board adds, on top of that, there was an outstanding information request. And then they cite a board law that says, the standard is that if it's a valid request, the employer doesn't object to that. The employer doesn't take it to this court. And object and say, actually, that information request was, they do it in their reply brief, but not before. So they don't, this case is riddled with failures by the employer to raise its objections at the proper time. The board added the information request. In its decision order said, this is another basis to find that you were not at impasse. If the employer didn't like that, the employer should have filed a motion for reconsideration. Let me ask you about that. So here the board sua sponte considers, for instance, the idea that issuing the layoff notices, right, is a violation. But then they say that Riverstone fails to preserve this issue. So I'm kind of wondering how these standards intersect. So for the board to sua sponte raise an issue, the standard is, you're only allowed to add new claims if the claim is closely related to the complaint and the issue is fully litigated. Sure, yeah. So if you, if the board passes that standard in order to bring up a new issue, how does the petitioner here fail under section 10E for failure to raise the issue, right? Because if it's been fully litigated and if it's closely related to the claim, then how is there no jurisdiction under 10E? I mean, don't these standards, aren't these standards sort of two sides of the same coin? I don't think I would say that they're two sides of the same coin, although I will admit that it's sort of a sticky issue when the board has reversed the initial 8A3 violation, which is a discrimination-based violation. They say, that's not the one, we don't agree with it, administrative law judge. And instead they go with a non-motivated, non-motive, coercive interference. But it's a different legal analysis too. So I think what's, so the closely related is in the context of when the board is able to still decide an issue because there's a factual record and it was something that the parties fairly litigated. There weren't additional facts if the original complaint had alleged, this is sort of the theory I think, if the original complaint had alleged the issuance of these layoff notices had the tendency to coerce or interfere with the exercise of Section 7 rights. If it had alleged that, the employer wouldn't have put on a different case than it did. That's the conclusion of we can still reach this issue. We think the employer and the general counsel, for that matter, put on all the evidence that they would have otherwise. But I don't think that relieves the employer of its obligation or any party, and it doesn't have to be the employer, any party of its obligation when the board sua sponte acts. Because oftentimes this is how the board is sua sponte acting. They couldn't just find a violation out of thin air. It has to be something where it's either closely connected or otherwise you see sort of a different view of the record evidence. So if it's closely connected and fully litigated, though, then how is it not reserved? Because they didn't object to the fine. They didn't file exceptions to, they filed exceptions related to the 8A3. And in this case, I'll admit that the. You see the problem. I do. And I think what's particularly difficult in this case. The board gets to just add things. Based on the standard, but then, you know, the petitioner, you know, the party that's being charged doesn't have the same consideration, right? It's not, it's not symmetrical, right? No, but they, they certainly were not on. They were on notice that the board changed, changed the decision or they were on notice that their liability changed between what the administrative law judge found and what the board found. So I don't think it's an, I don't think it's an onerous burden for them to have filed a motion for reconsideration. But here's what, here's what I was trying to say, where I think in this case, it gets a little more complicated. Here's because it's sort of figure out, well, didn't they do enough when they objected to the 8A3 as opposed to the 8A1? And I think the problem here is fact bound to this case. I think there is still a fundamental misunderstanding on the part of the employer on what the analysis is for the board on the 8A1. Meaning they continued to brief in this court the same things that they objected to when they filed their exceptions on the 8A3. So I've, so I think their brief looks quite honestly, the same as it would if they're, if they were only objecting to the 8A3. So I think that's creating some of the confusion that normally you would see if somebody properly preserved the 8A1 and properly preserved the coercive interrogator, sorry, the coercive conduct, you would see a different argument being launched. And then we would be in a different position and a better position, I think, for illustration purposes to say, this is why you can't do it. You didn't tell the board this. The fact is a little bit strange here in that they didn't change their argument. They still continue to maintain the proximity is, the proximity, it doesn't matter. That's an 8A3, that's an 8A3 argument. That's not the board's argument. The board's argument is that they couldn't really raise those issues unless they sought reconsideration. Right, right. No, and we still couldn't change their theory, you know, in a petition here. No, no, but I'm saying for illustration purposes and for sort of coming up with this, that it's difficult to see why didn't they do enough. I think part of the reason that it's not clear in this case why they didn't already do enough is because their argument hasn't changed. So I think in the context, so, but the board's position remains the same, whether you continue to advance these arguments under an 8A3 violation, even though that's no longer the theory, or you didn't properly preserve it and you didn't preserve the arguments. And I think curaleaf that just issued out of this court on Tuesday is a little helpful in this. The court there, it's an unpublished decision because they didn't break it in new ground or anything. But in that case, the court talks about challenging facts and making legal arguments matter. And it was specifically for the purposes of Tenney. So I think that's what we have here. You have the employer basically objected to the facts because they have the same underlying facts, but didn't make the legal argument. And again, it's not directly on point, but I think it's a useful- The board didn't come up with a new legal argument based on the fact that it's closely connected and fully litigated. Right, and all the board then is saying, if you still have an opportunity to tell the board, we think you got it wrong. We think you got it wrong. Here's why, file your motion for reconsideration. So just because the board has the opportunity to, in fact, what they did was they corrected, this is what we want, right? They corrected the administrative law judge, said this wasn't an 8A3, but you didn't look at this in the different context through a different lens of the 8A1. But employer, you have the opportunity to tell us why you still think we got it wrong. They didn't do that. And that precludes this court's jurisdiction. And Loper-Bright had no effect on this court's jurisdiction under 10E. I don't think I'm over my time, unless there were other specific questions. Let me ask the full enforcement. I couldn't tell if you had a question, Judge Randolph. I thought you were taking your glasses off to ask them. Thank you, I appreciate it. Thank you. Rebuttal, Mr. Eggers. We'll give you two minutes. It's difficult to imagine any case that would be a more obvious case of impasse than this one. To the extent there was any uncertainty going to the meeting in July, when I asked the union if they would accept a new contract that did not have contribution to the fund, and they said no. And they asked me the question, would we accept a new contract that did have contribution to the fund? And we said no, any uncertainty was at an end. That was definite. The comment by the intervener that there were other issues to bargain over, and the comment that was made then about we'll think outside the box, none of that negates the fact that we clearly were at impasse. If this court were to ever accept the argument that saying think outside the box or there are other issues to bargain over, would somehow cause there not to be an impasse, I can assure this court- There'll never be an impasse. I would bet, I'm not a betting man, I would bet every nickel that there will never be an impasse, and that I agree with you completely, Judge. Thank you, Your Honor. Now, I would urge this court to set aside or modify what has happened here so that there is not a finding of any unfair labor practice by my client. Thank you. Thank you. Mr. Davidson. We'll give you two minutes. Thank you, Your Honor. Just very quickly, a few comments that Mr. Eggers has made throughout was he asked the question, we said no. We asked the question, they said, that is two seconds of a negotiation session. There were, after we said, after he- My recollection is it was clear. I will take another look, but what I want to ask you is, it's against this backdrop of years and years of the parties being unable to bridge that issue. There was, yeah, numerous back and forth, and at that point in time, on the 12th, we said no, but, comma, but, we're exploring it, we're looking into it. We send an information request. We're putting back a counterproposal. We will draft a counterproposal. And in fact, we did draft a counterproposal that the parties ultimately used to come to a final agreement. So with CalMet, it's a three-part test. So we were not at impasse on this issue because we were drafting a counterproposal, and we did draft a counterproposal. And secondly, is this a critical issue? The judge doesn't get to it. I'm not conceding that it is a critical issue. I mean, not every issue we bargain is critical. Is it important? Yes. Is it critical? They would say yes. It wasn't a critical issue. And in fact, we were able to bargain and come to a resolution. Number three, was it a breakdown of overall negotiations? Absolutely not. We hadn't even talked about wages. We hadn't talked about contributions of health insurance. It was not a breakdown of overall positions and proposals. So Mr. Eggers is taking one question, and that happens in negotiations. Are you willing to move on this? No. That doesn't mean you're at impasse. That's the give and take. But in his mind, in Riverstone's mind, what it meant was, all I have to do is get him to say no once, and I can leave the bargaining table, and I don't care what they say. And that's exactly what he did on the 12th and on the 21st. I heard you say no, bye. That's not how negotiations work. That's, and it was a threat as far as we had a union steward and another bargaining team, employee bargaining unit member at the bargaining table listening to this from the other side. So with that, we were not at impasse. Thank you, Your Honors. Thank you, Counselor. Thank you. The case is submitted.
judges: Katsas; Rao; Randolph